**REEVES et al. v. CITY OF DALLAS.**

**No. 13671.**

Court of Civil Appeals of Texas. Dallas.

May 10, 1946.

Rehearing Denied June 7, 1946.

J. N. Townsend and Alvin H. Lane, both of Dallas, for appellants.

H. P. Kucera, City Atty., and A. J. Thuss, Jr., Asst. City Atty., both of Dallas, for appellee.

BOND, Chief Justice.

On motion for rehearing appellants call our attention to matters which escaped notice and ask for additional findings, which we deem warrants the withdrawal of our former opinion to correct and relate factual and procedural matters pertinent to this appeal; and, for further consideration of the record, we set aside our former opinion and substitute the following, affirming the judgment of the court below as of this date.

The City of Dallas, under its right of eminent domain, condemned, for the purpose of enlarging and extending the limits of the municipally-owned Love Field Airport, 2.285 acres of land as a whole. Two different estates were involved in the condemnation, and the interest of each estate was apportioned by the condemnation commissioners. D. R. Reeves and wife were the owners of the land and improvements; Flight 21, Ltd., was the owner of a leasehold, conducting a restaurant and dance hall on a portion of the land.

The involved 2.285 acres of land, approximately 100,000 square feet, is located at the northeast corner of the intersection of Lovers Lane and Lemmon Avenue (extended streets of the City of Dallas), about 175 feet facing on Lemmon and about 308 feet on Lovers Lane. The land was unimproved, except that portion in the southwest corner which was leased and occupied by the appellant Flight 21. At the time of condemnation, it was outside the limits of the City of Dallas and within an area for the most part vacant acreage. On

the west and across Lemmon Avenue was the field of the municipal airport; on the north and south, about 400 feet away, was the airport administration building, post office, telephone exchange, and one or two other buildings and residences; on the east, some 500 or 600 feet away, was a thickly settled residential section of the City, known as Bluff View Estates. The property is about five miles from Dallas County Courthouse and the main retail business arteries of the City. Flight 21 was the only commercial business within the area. It is in evidence that Mr. Reeves's property was admirably suited for the business conducted by the lessee, under the then existing environment—war activities, airplane assembly plants (Lockheed's), Army and Navy training camps, and Ferrying Command groups. About one mile south, facing Lemmon Avenue, was another industrial or commercial area known as the Weichsel property, and between the two areas was a large section devoted to negro residences and retail businesses.

In 1941 Mr. Reeves entered into a lease contract with Maurice Caranas, acting for Flight 21, Ltd., for a portion of the property—105 feet fronting on Lemmon Avenue and 308 feet on Lovers Lane—for a term of 9 years and 6 months. In the contract the lessee agreed to pay $95 per month for the first 12 months; $100 per month for the next 42 months; and for the last 60 months $100 per month plus a percentage of gross profits; and at the termination of the lease period, it would pay $200 per month for holdover possession until vacated. The contract further provides that the lessee shall, at his own expense, erect on the leased premises a new frame restaurant building with second-story deck for dancing, which improvements shall become the property of the lessor, and that, during the life of the contract, the lessee shall keep the improvements in repair, keep it insured for benefit of the lessor, and pay all taxes. In all of the particulars mentioned, the lessee complied with the terms of the contract; erected the restaurant building with deck at an expense of approximately $10,000.

On December 9, 1944, the City of Dallas condemned the whole of the land with the improvements and leasehold. The owners of the land and improvements and the owner of the leasehold were parties defendant. An order was entered for possession of the whole of the land and premises, subject to the lessee's being permitted to continue its occupancy until after the Christmas holidays, that is, until January 15, 1945, when Flight 21, Ltd., was thus compelled to close its business and remove from the premises its personal effects.

We think the primary and controlling issues involved in the suit are: (1) The reasonable market value of the land and improvements as a whole, encumbered with the lease contract; and (2) the reasonable market value of the leasehold apportioned to the owner thereof. On trial to a jury, only two questions were submitted and answered, viz.:

"Special Issue No. 1. What do you find from a preponderance of the evidence was the reasonable market value, in Dallas County, Texas, on December 9, 1944, of the land and improvements involved herein subject to the leasehold interest of the defendant Flight 21 and excluding the market value of the leasehold interest of the defendant Flight 21? Answer in dollars, if any, and cents, if any." The jury answered "$15,000."

"Special Issue No. 2. What do you find from a preponderance of the evidence was the reasonable market value, on December 9, 1944, in Dallas County, Texas, of the leasehold interest of the defendant Flight 21, in the land described in the lease with defendant D. R. Reeves? Answer in dollars, if any, and cents, if any." The jury answered "$16,000."

In connection with the two aforesaid issues, the trial court instructed the jury:

As to Special Issue No. 1: "You are instructed that by 'reasonable market value' as used in this issue is meant the price the property would bring when offered for sale by one who desires to sell but is not obliged to sell and is bought by one who desires to buy but is under no necessity of buying."

As to Special Issue No. 2: "You are instructed that by 'the leasehold interest of the defendant Flight 21' is meant the right to the use and occupancy of the land de-

scribed in the lease with the defendant Reeves for the balance of the lease term upon the payment of the rental and the performance of the other terms of the lease. You are instructed further that by 'reasonable market value of the leasehold interest' is meant the price the leasehold interest would bring when offered for sale by one who desires to sell but is not obliged to sell and is bought by one who desires to buy but is under no necessity of buying."

On the findings of the jury, the trial court entered judgment for defendants for the amount found to be due each of them, which, in effect, was a finding of $31,000 for the property condemned as a whole, including the value of the leasehold estate; apportioned to the respective owners in accordance with the findings. All parties appealed.

In the course of trial, the two condemnees, Reeves and Flight 21, filed separate defenses, separate only as to the value of their respective property rights and the consequential damages resulting from the condemnation. In developing their respective defenses, evidence, unrestricted, was offered as to the value of the two estates as a whole, and as to the value of their separate entities; hence, to a great extent, only by a process of mathematical calculation was the value of each separate estate ascertainable in conformity with the issues submitted.

The City of Dallas assigns error to the form of the questions, contending that they had a tendency to confuse the jury to award double damages to the parties at interest; also assigns error on the findings of the jury as being excessive. However, such assignments are urged to be reviewed only on reversal of the judgment and remand of the cause on any assignment of error by either of the other parties. From the disposition we make of this appeal, we deem it unnecessary to further mention or consider the City's various contentions.

Appellant Reeves and wife made no objection to the form of the questions, only assigning error to the action of the trial court in refusing to grant them a new trial: (1) Because the award of $15,000 to them finds no support in the evidence is contrary to the overwhelming preponderance of the evidence, and grossly inadequate to compensate them for the property taken; (2) because of misconduct of the jury in awarding $16,000 to appellant Flight 21; (3) because of evidence admitted over their objection showing the price paid for the land five years before trial of the cause. In effect, we think, the assigned errors (1 and 2) challenge the inadequate apportionment of the award between the two defendants, in that, appellant Reeves should have received a greater amount than $15,000, and defendant Flight 21 should have received a lesser amount than $16,000. It seems that the inequality of value, as claimed by Reeves, and apportioned by the verdict, is the result of the form in which the issues were submitted.

Appellant Flight 21 assigns error to the action of the trial court in refusing to allow it to prove and recover (1) any subsidiary or consequential compensation for damages done to its restaurant and night club business; (2) for loss of anticipated profits for and during the unexpired term of its lease—five and one-half years; and (3) for its damage or expenses incident to moving its fixtures, caused by the condemnation of the freehold estate.

We will first consider appellant Reeves's assignments of error.

All of the ultimate issues of fact concerning the fixation of the reasonable market value of the real estate, improvements and leasehold involved, are either proved by or attempted to be proved by so-called "expert" or "opinion" testimony. It is well known that such testimony fluctuates greatly according to the interest of the witness in the subject matter of the suit, or according to who calls him as a witness. Such evidence gives the jury wide latitude in determining the value of such testimony, and in drawing their own just conclusion. The measure of real estate values, or value of any property, is ordinarily based upon and determined from the price such property would bring when offered for sale by one who desires to sell but is not obliged to sell, and is bought by one who desires to buy but is under no necessity of buying. In other words, the value is

measured by a voluntary and unconditional offer and acceptance of the price, under all prevailing circumstances. But, where the property is not offered for sale, and the owner does not wish to sell, or the owner is forced to take a price in condemnation, as in this case, many elements go to determine the market value of the property taken. The location and environment of the property, the purchase and sale price in an open market of similar property in the same or near-by vicinity, the price that was voluntarily paid for the property taken, the availability of the property for similarly zoned business, the kind and character of occupancy, the encumbrances, contracts, liens, leases, etc., and many other elements, would be considered by an expert witness, as well as by the trier of the facts. Expert witnesses qualify themselves from experience and from past known events, and from such knowledge and experience give their conclusions; and, in some instances, advance opinions, speculative or anticipatory, as to what may reasonably occur. Knowledge of such elements and dealings in such property, evidently qualify "expert" or "opinion" witnesses to give evidence of present value. It might be said that no one of such elements, or any particular group of same, would establish absolute true value; but, on hearing of such predicated opinion and all testimony bearing on the issues of value, the jury is enlightened to give weight to the evidence and render its own conclusion. A more difficult situation arises in determining the future; one party's opinion as to the future, is of as much probative value as that of another. In this day and time, owing to fluctuation of values, change of conditions and environment make the future uncertain, and opinions hazardous.

 Following the ruling of the court that the two estates must be separately appraised, some expert witnesses based their valuation of the land and improvements, with the lease, as a whole. Manifestly, the value was increased or diminished by the value was increased or diminshed by the lease contract) was an element to be considered by the jury in arriving at the value of the fee. Indeed, the fee may have had an independent value, free from the value of the leasehold; but the value of the fee necessarily was affected by the value of the lease. In other words, if the lease contract was advantageous to the land and improvements, then the reasonable market value of the fee would be enhanced accordingly, and vice versa. So, in disposing of appellants' points of error challenging the action of the trial court in overruling their motion for a new trial for insufficient or lack of evidence to support the findings of the jury, we must exclude all testimony in conflict with the findings, and consider only that most favorable to the findings and the judgment of the trial court.

It is in evidence (over appellant Reeves's objection) that Reeves purchased the land condemned for $500 per acre and subsequently purchased another tract or parcel of land adjacent to that condemned, but the price paid for the second tract was not put in evidence by the defendant. There is also in evidence (testified to by Mr. Reeves) that other real estate, located about a mile from the Reeves property and in the same general direction from the City of Dallas, known as the Weichsel property, located on Lemmon Avenue, highly industrial or commercial, nearer the retail business section of the City, in neighborhood of large manufacturing establishments (Coca Cola plant, Hager's Pants Manufacturing Company, a large bakery, and other manufacturing enterprises), sold and was selling shortly before this condemnation at a price of 10 cents per square foot. There is also expert and opinion evidence upon which the jury could find the market value of the land and improvements condemned, encumbered with the leasehold estate, variously estimated, ranging from $10,000, $12,500, $20,000, $30,000, to $50,000; and that the value of the leasehold ranging from $1,000, $60,000, $70,000, to $100,000. Mr. Reeves himself gave testimony that at the time of condemnation he valued his property at $50,000, which included the property as a whole encumbered with or subject to the lease. He further testified that a short time before, and at a prior hearing of this cause, he placed the market value of the condemned property with or subject to the leasehold estate, at $30,000, justifying the increase in his estimate from $30,000 to

$50,000 as a natural increase in value between the two dates involved in his testimony.

Mr. Slaughter placed the value of Mr. Reeves's estate at $50,853.77; a Mr. Jones testified that the value of the condemned property as a whole was $20,000; that in ordinary times the value would be $8,500, but, in view of inflationary values everywhere, the value of the property at time of condemnation, excluding any subsidiary estate, would be $20,000. Mr. Eastus fixed the value as a whole, including the value of the leasehold, at $27,560.94; Mr. Bale placed the market value of the property condemned, together with the subsidiary estate, at $31,500, "that is, all the interest and all the property." Witnesses Hancock and Wolfe gave the value of the land and improvements, exclusive of the value of the leasehold, at from $60,000 to $70,000. Mr. Caranas fixed the leasehold value, independent of the value of the fee, at $100,000; Tom Semas, at $65,000 to $70,000; Louis Bouis, at $60,000 to $70,000. There is also in evidence that the value of the lease was from $1000 to $100,000; that Mr. Reeves's improvements at the time of condemnation was $10,000, and that in the past few years real estate values had increased 100 percent. These widely varying estimates of market value gave a basis for the jury's finding of $15,000 for appellant Reeves's interest in the condemned property.

The jury being the exclusive judges of the weight and credibility to be given to any and all testimony, we are not authorized to set aside their verdict. Russell Coleman Oil Mill v. San Antonio, U. & G. R. Co., Tex.Civ.App., 37 S.W.2d 165; Roberts v. County of Robertson, Tex. Civ.App., 48 S.W.2d 737; White Co. v. State, Tex.Civ.App., 131 S.W.2d 326. Therefore, the jury having exercised its function and decided the issues, its findings are final. City of Corpus Christi v. McLaughlin, Tex.Civ.App., 147 S.W.2d 576.

While Mr. Reeves may feel, as he does, that he did not receive full value for his estate and that Flight 21 received more than it was entitled to, as embodied in appellant Reeves's assignments of error, and while the City of Dallas urges that both Mr. Reeves and Flight 21 received more than they were entitled to under the evidence, yet we cannot say that the verdict of the jury and the judgment of the trial court have no support in evidence.

Appellant Reeves's second point of error assigns misconduct of the jury for lack of any orderly or natural process of reasoning in arriving at their ultimate conclusion of $16,000 for the market value of the leasehold; and that $31,000 being the value of all interests to everybody, freehold and leasehold, the jury unjustly and unlawfully apportioned that total between the owner and the tenant. On hearing of appellant's motion for new trial, some jurors gave different versions of how they arrived at the $16,000 and the $15,000. One stated that they allowed $7,500 for the land, $5,000 for the building, and $2,500 for loss of rents; another $3,000 for advertising for new location for the tenant's business, $6,000 for increased rents, $4,800 for loss of profits, $800 for moving; and so on. We do not feel at liberty to ferret out or analyze the jury's process of reasoning. The jury may have considered matters not relevant to the value of the leasehold alone, and truly may have awarded appellant Flight 21 a greater amount for its subsidiary interest than some evidence warrants. However, the values of the two estates were sought separately, and separately submitted to the jury; hence, assuming that the jury gave a greater amount than was justly due to Flight 21, and not enough to Reeves, the matter is not to be considered by this court. The evidence was of such nature, quantity and quality, as to support the jury's finding of value for the leasehold, independent of the value of the freehold. So, if any misconduct of the jury occurred in arriving at the values placed on the leasehold, such cannot be of legal concern to the freeholder.

In appellant Reeves's third point of error, complaint is made to the action of the trial court in admitting on cross-examination his testimony as to what he paid for the land condemned—$500 per acre, in

1939. Appellant objected, because same was "immaterial, too remote, and had no bearing on its present market value." We think there was no error. The price paid for the land was an element to be considered—not conclusive, and alone, perhaps, of little weight or value in determining the issues involved in this case; certainly, if error, not such as to cause injury to the appellant, or reversal of this cause. All assignments and points of error presented by appellant Reeves and wife are overruled.

Appellant Flight 21's two points of error complain of the trial court's refusal to give any compensation for damages to its business; also for loss of profits for the unexpired term of its lease.

It will be seen that appellant makes no specific points in brief on its assignments of error on the action of the court in admitting or refusing testimony upon which specific loss or damage may have been awarded; or on the action of the trial court in sustaining the City's special exception to its pleadings, striking out its allegations pertaining to its loss of business and anticipated profits; or on the action of the court in excluding the testimony of Maurice Caranas, to-wit: That when the City condemned his leasehold interest he had no place to locate his business; that he employed numerous real estate agencies without finding a location; that his night club business, as a going concern, was reasonably worth $100,000 *to him,* and that to remove his business to another location would destroy his trade name (Flight 21, Ltd.), as well as his business; that his removable fixtures located in the leased premises, costing about $10,000, would be worth only from $1,000 to $2,500 as salvage; and that, having the leasehold taken away from him, with his lease to run another five years and ten months, he figured that he would "be damaged close to $200,000." The appellant Flight 21 does not complain of the finding of the jury awarding $16,000 as the market value of its leasehold. In effect, it accepts the submission of the issues and findings of the jury as having support in evidence on that phase of his claim for compensation. The only manifestation of error urged is that the submitted special issue No. 2 eliminated from the jury's consideration the loss of anticipated profits and damage to appellant's business, the removal costs, and depreciated value of its personal effects, in arriving at adequate compensation for the taking of its leasehold.

■ It will be seen from the record that appellant Flight 21 alleged that "The only issues to be determined by the court and jury in this instance are what sum should be paid to defendants D. R. Reeves and wife, as the adequate compensation for the taking of their property by the City herein provided for in Article 1, Section 17, of the Constitution of the State of Texas, and what sum should be paid to this defendant as such adequate compensation for the taking of its leasehold estate in said property." So, the trial court having submitted the two issues under appropriate instructions, and the jury having found the values of the estates condemned, measured by the rule as to what such property would bring when offered for sale by one who desires to sell but is not obliged to sell, and is bought by one who desires to buy but is under no necessity of buying, we think there was no error in the trial court's refusal to entertain Flight 21's allegations, evidence and special issues, duly and properly presented here for review, embodying anticipated profits which it expected to receive for the unexpired term of its lease, damage to its going business, its trade name, and expenses incurred in moving its personal effects. Such were not recoverable as specific items of loss or damage, where the estates were taken as a whole, and could have no appreciable effect on the issues involved in the suit.

■ There can be no question but that a leasehold is property, business is property, and one holding such entities is entitled to remuneration for the taking of same. A condemnation proceedings is a proceedings in rem; it is not a taking of rights of persons in the ordinary sense, but an appropriation of physical properties. If, perchance, the land condemned is encumbered, as here, with a lease or other conflicting claims, the condemnor is liable not only for the reasonable market value of the land taken, but also for the reasonable market value of other conflicting claims as

a whole. The land, lease, and all other conflicting claims on the property condemned must be determined as if all the property was in a single ownership. City of Waco v. Messer, Tex.Civ.App., 49 S.W. 2d 822; Id., 124 Tex. 417, 78 S.W.2d 169. All such matters must be taken into consideration in determining the value of the condemned property as a whole; the land value thus determined carries with it the value of the lease or other conflicting claims, and the value of the leasehold carries with it all incidental items making up its apportioned value.

In this case, without objection or exception from the owner of the land, the jury, in effect, found the value of the condemned estates as a whole $31,000; apportioned to the owner, Reeves, the value of the landed estate, and to the lease holder, Flight 21, the value of its lease. In such case, the elements that went to make up the value of the subsidiary estate and to qualify expert witnesses to express opinions as to its value, are: the kind and character of the property upon which the lease is attached, its location and accessibility to the public, the terms and conditions of lease contracts, the adaptability of the leased premises for the purposes for which the lease was given, and the profits or loss in the operation of the business on the leased premises. The trial court permitted Flight 21 to allege and prove all the aforesaid elements, particularly to prove the profits accruing from the business and damages during the time the lessee was *actually in possession*, on the theory that such profits and damages were elements for consideration of the jury in determining the market value of the leasehold estate, and for no other purpose. The jury had before them evidence as to all the details of the going business, and from that evidence determined the value of the lease.

Appellant's contention is that under the Constitution, Art. 1, sec. 17, Vernon's Ann. St., and relevant statutes, Art. 3265, R.S., his damage may be measured by the loss of profits which he expected would accrue to the leasehold during the unexpired term of the lease. If such contention is sound, why stop at the end of the unexpired term of the lease, if, perchance, the business he was then conducting should have continued to the end? If the anticipatory profits of the business, or loss of the business for the unexpired term could be determined, say at $200,000 as claimed by appellant, then, for an indefinite period after the expiration of the lease, appellant as a holdover tenant, or the owner, or landlord, would have a claim for a staggering amount. The right or position of the owner of the land and improvements is not circumscribed by the tenancy for years; and, therefore, if the rule should be established that a tenant is allowed to recover his anticipated profits or loss of business in futuro for the term of his lease, then certainly a fee owner conducting a business on his own property should be entitled to profits in futuro, measured by the duration of his anticipated ownership—theoretically in perpetuity—certainly for the life expectancy of the owner. Stating the rule contended for by the appellant, and realizing its consequences, justifies its rejection under any reasonable consideration..

Text writers and judicial opinions hold to the rule that loss of business, profits, good will, fixtures, and costs of removal suffered by a tenant, where there has been a full appropriation of the estate, as here, and there has been a full and complete taking of both estates, unto which the title has been divided, are not recoverable. Lewis on Eminent Domain, 3d Ed., sec. 727, states the rule that while it is proper to show how the property is used, the kind and character of the business and the resulting damage by the taking of the entire property, " * * * it is incompetent to go into the profits of the business carried on upon the property. No damages can be allowed for injury to business. The reason is that the constitution and the statutes, as ordinarily worded, requires only that just compensation shall be made for the property taken. Just compensation * * * where an entire property is taken, is the market value of the property, and where a part is taken, it is the value of the part taken and damages to the remainder by the taking and use of the part for the purpose proposed. The business conducted upon the property is not taken and the owner can re-

move it to a new location or continue it upon the part of the property which remains. Any incidental loss or inconvenience in business, which may result from a removal or change consequent upon the taking, must be borne by the owner for the sake of the general good in which he participates."

See also Orgel on Valuation Under Eminent Domain, sec. 71, in which the author pronounces the same rule, quoting with approval City of Newark v. Cook, 99 N.J.Eq. 527, 133 A. 875, 879:

"Loss of business, profits, good will, fixtures, and costs of removal and the like suffered by the tenants are obviously not lands or real estate, or rights or interest therein in the legal sense and not within the criterion fixed by· the statute." Then the author states that such damages are "consequential, and so remote and uncertain as to be incapable of just computation."

The rule of damages fixed by Texas Revised Statutes 1925, Art. 3265, sec. 2, insofar as it applies to condemnation of property, where the whole is taken, provides:

"When the whole of a tract or parcel of a person's real estate is condemned, the damages to which he shall be entitled shall be the market value of the property in the market where it is located at the time of the hearing."

While there are no Texas cases with the factual background as involved in this case, yet the authorities of other jurisdictions are clear, and they follow the rule as stated by the foregoing text writers. In United States of America v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357, 360, 89 L.Ed. 311, 156 A.L.R. 390 (a condemnation suit), the U. S. Supreme Court, speaking through Justice Roberts, held:

"The sovereign ordinarily takes the fee. The rule in such a case is that compensation for that interest does not include future loss of profits, the expense of moving removable fixtures and personal property from the premises, the loss of goodwill which inheres in the location of the land, or other like consequential losses which would ensue the sale of the property to someone other than the sovereign. No doubt all these elements would be con-

sidered by an owner in determining whether, and at what price, to sell. No doubt, therefore, if the owner is to be made whole for the loss consequent on the sovereign's seizure of his property, these elements should properly be considered. But the courts have generally held that they are not to be reckoned as part of the compensation for the fee taken by the Government. We are not to be taken as departing from the rule they have laid down, which we think sound. Even where state constitutions command that compensation be made for property 'taken or damaged' for public use, as many do, it has generally been held that that which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage."

See United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787, 28 L.R.A., N.S., 385, 19 Ann.Cas. 680; United States v. 40.558 Acres of Land in New Castle County, D.C., 62 F.Supp. 98; United States v. Canadian Pacific, etc., D.C., 62 F.Supp. 115; Jaster v. Stahlheber, Ohio App., 34 N.E.2d 276; City of Bellevue v. Stedman, 63 Ohio App. 150, 25 N.E.2d 695; Fiorini v. City of Kenosha, 208 Wis. 496, 243 N.W. 761.

The appellant takes the position that the Federal constitution and the constitutions of the other jurisdictions are not as broad as the Constitution of Texas (Sec. 17, Art. 1) which provides:

"No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person."

The Federal Constitution (Article V) provides that:

"No person shall be * * * deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

While the Federal Constitution uses only the word "taken," and the Texas Constitution uses "taken, damaged or de-

troyed," yet the term "taken" has been given a meaning to include the words "damaged" and "destroyed." The two terms are synonymous and convertible; each denotes the money to which the owner of property subject to eminent domain is entitled. The word "compensation" is used in the Texas Constitution, but "damages" is the word employed in the Eminent Domain statute. "Compensation" and "damages" also must be regarded as convertible terms.

In United States of America v. General Motors Corporation, supra, the word "taken" in the Federal Constitution, is construed to include every right or interest affected by the appropriation. "The constitutional provision is addressed to every sort of interest the citizen may possess." In Gulf C. & S. F. R. Co. v. Fuller, 63 Tex. 467, our Supreme Court gave the term "taken" in the Federal Constitution, the equivalent of "damage" or "injury" as used in the Texas Constitution, meaning "every loss or diminution of what is a man's own, occasioned by the fault of another." See United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787, 28 L.R.A.,N.S., 385, 19 Ann.Cas. 680; Richards v. Washington Terminal Co., 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088, L.R.A. 1915A, 887; United States v. 40.558 Acres of Land in New Castle County, D.C., 62 F.Supp. 98.

Appellant cites the case of Hart Brothers v. Dallas County, Tex.Com.App., 279 S.W. 1111, as the leading case in Texas to the effect that loss of business, prospective future profits and consequential damages arising out of condemnation, are recoverable. We do not think the Hart case and the other authorities (City of La Grange v. Pieratt, 142 Tex. 23, 175 S.W. 2d 243; Milam County v. Akers, Tex.Civ. App., 181 S.W.2d 719) cited by the appellant are authoritative on the issues here involved. There was no "taking" of the whole of the estates in condemnation in those cases. It was not shown, as here, that Hart's property was taken as to fix their damages once for all in the value of the property "taken, damaged or destroyed." If future business or future profits should be allowed in condemnation proceedings where there has been a full, final and complete appropriation, there would inevitably result a rule of damages variable even on property similarly situated and of the same basic value.

After reviewing all the authorities submitted, we are of the opinion that they are in accord with the rule that future rights, business losses and profits are not recoverable where the whole of the estates are "taken" for public use. The "whole," or "all" of an estate includes all component parts; and just compensation to be paid for the whole at the time it was taken includes everything then of value. Consequential rights of which one is deprived, or "personal injuries" sustained, as the result of condemnation, are not recoverable as "just compensation" for the taking of physical properties within the meaning of the applicable constitutional and statutory provisions in the condemnation of property as a whole. Homestead rights, business rights and all other consequential rights incident to possession of physical properties, are not property taken, damaged or destroyed appertaining to condemnation of real estate as a whole. Such rights must be subservient to the public's right of eminent domain.

Appellants' assignments are overruled; judgment of the court below affirmed.